## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re: | ) Chapter 11 |
| | ) |
| VASO ACTIVE PHARMACEUTICALS, INC., | ) |
| | ) Case No. 10-10855 (CSS) |
| Debtors. | ) |
| _____ | ) |
| JEOFFREY L. BURTCH, | ) |
| AVOIDANCE ACTION TRUSTEE | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | ) Adv. Pro. No. 11-52005 (CSS) |
| | ) |
| JOHN J. MASIZ, AND | ) |
| JOSEPH F. FRATTAROLI | ) |
| | ) |
| Defendants. | ) |

### OPINION[1]

COOCH AND TAYLOR, P.A.
Robert W. Pedigo
The Brandywine Building
100 West Street, 10th Floor
Wilmington, DE  19899-1680

Counsel to Jeffrey L. Burtch,
Avoidance Action Trustee

MCCARTER & ENGLISH, LLP
William F. Taylor, Jr.
Renaissance Centre
405 N. King Street, 8th Floor
Wilmington, DE  19801
-and-
Thomas Curran
McCarter & English, LLP
265 Franklin Street
Boston, MA  02110

Counsel for Defendants John
J. Masiz and Joseph F. Frattaroli

Date: October 9, 2012

Sontchi, J. _____

---

[1] This Opinion constitutes the Court's findings of fact and conclusions of law pursuant to Federal Rule of Bankruptcy Procedure 7052.

## INTRODUCTION

Before the Court is Plaintiff's motion for partial summary judgment.  Plaintiff has brought this action against two former officers and directors of Debtor, seeking to recover payments made by Debtor to Defendants in the weeks prior to Debtor's bankruptcy from the proceeds of a settlement between Debtor and a third party.

As the party requesting summary judgment Plaintiff must "put the ball in play, averring an absence of evidence to support the nonmoving party's case."  The burden then shifts to the defendants to identify "some factual disagreement sufficient to deflect brevis disposition."  More specifically, the "disagreement must relate to some genuine issue of material fact."  In order to demonstrate the existence of a genuine issue of material the defendants must supply sufficient evidence (not mere allegations) for the Court to find for them and to deny the motion for partial summary judgment.

In order to determine whether Plaintiff is entitled to summary judgment in this case the Court must determine whether there is a genuine issue of material fact as to one or more of the following:

1.      Were the funds at issue transferred to John J. Masiz ("Masiz") and Joseph F. Frattaroli ("Frattaroli" and, collectively with Masiz, "Defendants") not fraudulent conveyances because the funds were "earmarked" for them and, thus, were never property of the estate?

2.  Were the transfers to Defendants by Vaso Pharmaceuticals, Inc. ("Debtor" or "Vaso") – which was allegedly controlled by Masiz and Frattaroli - made with the actual intent to hinder, delay and defraud creditors?   More specifically, were

Defendants in a position to dominate or control Debtor's disposition of property such that the intent to hinder, delay, or defraud creditors may be imputed to Debtor rendering the transfers fraudulent?

        a.     Did Defendants possess the requisite intent to hinder, delay, or defraud Debtor's creditors?

          i.     Delaware Badge of Fraud 1: The transfer or obligation was to an insider

         ii.     Delaware Badge of Fraud 3 – The transfers were concealed

       iii.     Delaware Badge of Fraud 4 – Before the transfer was made, the debtor had been sued or threatened with suit

       iv.     Delaware Badge of Fraud 5 – the transfers were substantially all of the debtor's assets

         v.     Delaware Badge of Fraud 7 – The debtor removed or concealed assets

       vi.     Delaware Badge of Fraud 8 – The value of the consideration received by the debtor was reasonably equivalent to the value of the transfers

      vii.     Delaware Badge of Fraud 9 – The debtor was insolvent

        b.     Were Defendants in a position to dominate or control Debtor?

        c.     Was the domination and control of Debtor by Defendants related to Debtor's transfer of property to Defendants?

        3.     Did Debtor make the transfers without receiving reasonably equivalent value while Debtor was insolvent?

      a.     Under the totality of the circumstances did Debtor receive reasonably equivalent value?

          i.     Did Debtor receive fair market value for the transfers?

          ii.     Were the transfers made at arms' length?

          iii.     Did Defendants act in good faith?

      b.     Was Debtor insolvent at the time of the transfers?

4.     Were the transfers constructively fraudulent?

      a.     Were Defendants insiders?

      b.     Were the transfers on account of an antecedent debt?

      c.     Was Debtor insolvent at the time of the transfers?

      d.     Did Defendants know Debtor was insolvent at the time of the transfers?

5.     Are the transfers avoidable under section 550 of the Code?

      a.     Were the transfers were made for the benefit of Defendants?

      b.     Did Defendants receive the transfers in satisfaction of a present or antecedent debt, in good faith, and without knowledge that the transfers may be avoided?

6.     Assuming the transfers are avoidable for one or more of the reasons set forth above, is Plaintiff entitled to pre-judgment interest on the transfers from the date they were made?

As set forth below, there is a genuine issue of material fact in connection with some but not all of the issues identified above and the motion for partial summary judgment will be granted in part and denied in part.

## STATEMENT OF FACTS

**1. Procedural History**

On March 11, 2010 (the "Petition Date"), Vaso filed a voluntary petition for relief under Chapter 11 of Title 11 of the United States Code.  Soon thereafter, Debtor filed an adversary action against Iroquois Master Fund, Ltd. ("Iroquois"),[2] Vaso's pre-petition secured lender, to determine the validity, priority and extent of Iroquois's liens or other interests in Vaso's property (the "Iroquois Action").[3]  The parties settled the Iroquois Action, which was then approved by this Court (the "Iroquois Settlement Order").[4]  The Iroquois Settlement Order states, in part:

> The Noteholders shall have an allowed secured claim in this case in the amount of the outstanding principal due plus accrued interest as provided for under the Notes, secured by the collateral described in the Security Agreement dated August 16, 2005 . . . (the "Allowed Secured Claim").  The Allowed Secured Claim is not subject to offset, defense or counterclaim by Debtor or any third party, including any Chapter 7 Trustee.
>
> * * *
>
> Joseph Frattaroli and John Masiz hereby represent and warrant that they have not and will not in the future fraudulently transfer any of their assets, including without

---

[2] Vaso entered into a Securities Purchase Agreement dated August 16, 2005, with Iroquois Master Fund, Ltd. ("Iroquois"), individually and as collateral agent, Smithfield Fiduciary LLC, Rockmore Investment Master Fund, Ltd, Otago Partners LLC, as assignee of RAQ LLC, and Portside Growth and Opportunity Fund (collectively and including Iroquois individually and as agent, the "Noteholders").

[3] Adv. Pro. No. 10-50835.

[4] Adv. Pro. No. 10-50835, D.I. 20.

limitation the cash payments they received from the Debtor in December 2009 from the Settlement Funds, outside the reach of creditors.[5]

In October 2010, Vaso filed its Second Amended Chapter 11 Plan of Reorganization,[6] which was confirmed by the Court in November 2010.[7]  Pursuant to the confirmation order, Jeoffrey L. Burtch (the "Trustee" or "Plaintiff") was appointed as the Avoidance Action Trustee (as defined in the Plan) pursuant to 11 U.S.C. §§ 321-333 and assigned all avoidance actions and other claims under 11 U.S.C. §§ 544, 547, 548 and 550 to pursue for the benefit of Vaso's creditors.

Thereafter, Trustee commenced this present action (via the "Complaint") against Masiz and Frattaroli seeking avoidance of preferential transfers, avoidance of fraudulent transfers (under multiple federal and state theories), disallowance of claims, and unjust enrichment.[8]  Within weeks of the Defendants' answer to the complaint,[9] the Trustee filed a motion for partial summary judgment (the "Motion").[10]  Subsequently, the parties engaged in mediation, which, unfortunately, was unsuccessful.  Although a scheduling order was entered in the case, no discovery has occurred.

### 2.  Factual History

Vaso's business was commercializing over-the-counter pharmaceutical products developed by BioChemics, Inc. ("Biochemics") and manufactured by an independent

---

[5] Iroquois Settlement Order at ¶¶ 2 and 9.

[6] Del. Bankr. No. 10-10855, D.I. 96.

[7] Del. Bankr. No. 10-10855, D.I. 116.

[8] Adv. P. No. 11-52005, D.I. 1 (Unless otherwise noted, all docket references are to the adversary docket which is the subject of the motion for summary judgment, Adv. P. No. 11-52005).

[9] D.I. 5.

[10] D.I. 6 and 7.

third party.[11]  Masiz founded Biochemics in 1989 and is the majority shareholder and controls BioChemics.[12]  BioChemics, in turn, controls 77 percent of the voting interest in Vaso, which was founded by Masiz in 2001.  Frattaroli joined Vaso in January 2003 as CFO.  Frattaroli became President of Vaso in 2004 and acting CEO in 2005, and held such positions through the Petition Date.  Furthermore, Frattaroli has been a shareholder of BioChemics since 2002.  Frattaroli is not a shareholder of Vaso.

In 2003, Vaso engaged Robinson & Cole LLP ("Robinson & Cole") to represent it in connection with an initial public offering ("IPO") of its stock.  The IPO was completed on December 15, 2003.  Thereafter, Vaso and Masiz were involved in 16 securities class action lawsuits and an SEC lawsuit related to the IPO.  At the time, Vaso believed it had an action against Robinson & Cole related to (alleged) negligent legal advice made in connection with the IPO.  Vaso alleged that Robinson & Cole harmed Vaso as a result of the lawsuits filed by the SEC and private investors based on alleged misstatements attributable to Robinson & Cole.

Vaso settled its lawsuits with its stockholders and the SEC.  As part of the SEC settlement, Masiz agreed to refrain from serving as an officer or director of a public company, including Vaso, for five years.  Nonetheless, Masiz remained at Vaso as a "corporate strategist" at the same salary he had been receiving as an officer of Vaso.  Although Masiz could no longer sign documents and bind Vaso, Masiz remained active and handled the business dealings with Iroquois.

---

[11] *Vaso Active Pharmaceuticals, Inc. v. Robinson & Cole LLP*, No. 06-4958, 2009 WL 971161, *1 (Mass.Super. Jan. 23, 2009) (hereinafter, the "Robinson & Cole Opinion").

[12] Robinson & Cole Opinion at *1.

In August 2005, Iroquois and the Noteholders loaned Vaso $2.5 million, secured by a blanket lien in Vaso's property. At the time of the loan, Vaso's biggest asset was its claim against Robinson & Cole arising from the IPO. Iroquois was aware of the claim and discussed it with counsel to Vaso prior to loaning money to the company.[13]

In April 2006, due to Vaso's financial position, Masiz agreed to continue working at Vaso without pay. In May 2008, Frattaroli also agreed to forego his compensation as President, CFO and acting CEO. In their opposing papers the Defendants assert that, although they were foregoing compensation, they were not accruing unpaid wages.[14] There is evidence in the record, however, that is inconsistent with the Defendants' current position.[15]

In November 2006, Vaso brought a legal malpractice action against Robinson & Cole in the Superior Court of the Commonwealth of Massachusetts (the "Robinson & Cole Litigation"). Vaso was represented by Kelley Drye & Warren LLP ("Kelley Drye")

---

[13] Complaint at Exh. D (Deposition of Richard K. Abbe, April 23, 2010, 46:9-47:6) ("Abbe Depo.").

[14] *Defendant's Memorandum of Law In Opposition to the Trustee's Motion for Partial Summary Judgment* (D.I. 13) ("Opposition"), *Affidavit of Joseph F. Frattaroli In Support* [sic] *of Plaintiff's Motion for Summary Judgment* ("Frattaroli Aff."):

> 13.    During this time, Masiz and I [Frattaroli] were not accruing such unpaid wages.
>
> 14.    Pursuant to Massachusetts law, directors and officers are individually liable for a company's failure to pay wages and treble damages can be assessed.
>
> 15.    As such, I [Frattaroli] nor the Board of Directors would have subjected ourselves to such extreme potential liability by allowing over $900,000 of unpaid wages to accrue.

[15] Complaint at Exh. B (Deposition of Joseph Frattaroli, May 4, 2010, 92:14-96:8) ("Frattaroli Depo.") (Defendants received approximately $180,000 in 2009 for wages from the first time they went unpaid until they were paid plus interest at 10% APR).

in that litigation.  At the time of the filing of the Robinson & Cole Litigation, Vaso anticipated an award of between $30 and $60 million.[16]

Prior to filing the action against Robinson & Cole, in January, 2006, Vaso and Kelley Drye entered into a fee agreement (the "Kelley Drye Fee Agreement") with regard to the Robinson & Cole Litigation whereby Kelley Drye was to receive (a) 100% of its fees charged at normal billing rates; and (b) a 25% interest in the remaining balance of the recovery in the event the Robinson & Cole Litigation resulted in a settlement or the entry of a judgment or verdict.[17]  Pursuant to the Kelley Drye Fee Agreement, Kelley Drye was granted a lien in any recovery that was obtained in respect of the Robinson & Cole Litigation.[18]  At this time, Iroquois had a blanket lien on Vaso's personal property.

Thereafter, the Notes matured on May 1, 2007, at which time Vaso defaulted on the Iroquois Loan by failing to repay the principal balance.  To date, the Iroquois Note is in default (although Iroquois received a portion of the principal from the settlement of Iroquois Action).

Since 2007, Vaso has had little or no operations and no manufacturing capacity.  As of December 31, 2007, Vaso had total current assets of $121,004 and total current liabilities of $7,116,676.  As of September 30, 2008, Vaso had total current assets of

---

[16] Robinson & Cole Opinion at *3; Frattaroli Aff. at ¶ 26.

[17] Opposition, Exh. A (Settlement Agreement By and Between Vaso Active Pharmaceuticals, Inc. and Kelley Drye & Warren LLP) (Adv. D.I. 13).

[18] *Id.*

$100,556 and total current liabilities of $8,681,943.  In March 2009, Vaso voluntarily
ceased being a reporting company under the Securities Exchange Act.

Prior to 2009, Vaso believed it would be awarded between $30 and $60 million in
the Robinson & Cole Litigation.  However, in January 2009, the Massachusetts court
granted Robinson & Cole's motion for summary judgment on the issue of damages
sharply reducing Vaso's potential recovery.  Vaso had asserted that damages should be
measured by the drop in share price of a company's stock.[19]  The Massachusetts court
disagreed and limited Vaso's potential recovery to the amount of Vaso's actual
damages, which were approximately $12 million.[20]  At this time, Vaso's Board of
Directors authorized Frattaroli and Masiz to enter into mediation with Robinson & Cole
and authorized a settlement of not less than $12 million.

While the parties were engaged in mediation, the Massachusetts court made
additional rulings that further reduced Vaso's potential recovery.  More specifically, the
$12 million of potential damages referenced above included $7.5 million based upon
Vaso's return of funds to its lender at that time, Millennium Partners.[21]  Vaso returned
the funds to Millennium Partners because of breached covenants in the loan documents,
which Vaso claimed were a direct result of Robinson & Cole's negligence.[22]  However,
the Massachusetts court determined that Vaso could not recover these returned loan

---

[19] Robinson & Cole Opinion at *5-9; Frattaroli Aff. at ¶ 26.

[20] Frattaroli Aff. at ¶ 28.

[21] *Id.* at ¶ 30; *see also* Matthew Goldstein, *Vaso Active Lets Millennium Out of Convertible Deal*,
TheStreet.com, April 12, 2004 (http://www.thestreet.com/story/10153254/1/vaso-active-lets-
millennium-out-of-convertible-deal.html).  This was prior to Iroquois's involvement in Vaso, which
commenced in 2005.

[22] *Id.* at ¶ 30.

proceeds from Robinson & Cole, further reducing Vaso's maximum potential recovery in the Robinson & Cole Litigation to approximately $4.5 million.[23]

As noted above, at the beginning of 2006, Vaso stopped paying Masiz his $175,000 yearly salary due under his employment contract and Frattaroli's salary was deferred beginning in May, 2008 (the "Accrued Wages").  Frattaroli has testified that "[d]uring the pendency of the [Robinson & Cole] Litigation, Vaso's independent Board of Directors approved an arrangement between the Debtor and myself [Frattaroli] and Masiz whereby we would receive payment in consideration of their uncompensated services rendered to Vaso, if, and only if, Vaso was successful in the [Robinson & Cole] Litigation."[24]  Frattaroli continues:

> 21.    To determine the market value of the services rendered by Defendants, I engaged the expertise of outside consultants.    These outside consultants, principals at placement firms in the Boston area, advised that the average based salary for a CFO in the greater Boston area was $150,000 to $350,000, and estimated that I should expect to make approximately $175,000 at Vaso with an additional bonus of $50,0000 [sic] per year.

> 22.    The Board of Directors reviewed the consultant report and determined that $175,000 per year plus a $50,000 bonus was an appropriate valuation of the services that Masiz and I [Frattaroli] rendered to Vaso.[25]

On December 19, 2009, Vaso and Robinson & Cole entered into an agreement resolving the Robinson & Cole Litigation in exchange for a $2.5 million payment from

---

[23] *Id*. at ¶ 31.

[24] *Id*. at ¶ 19.

[25] *Id*. at ¶¶ 21-22.

Robinson & Cole to Vaso (the "Robinson & Cole Settlement Agreement").  Neither Kelly Drye nor Defendants were parties to the Robinson & Cole Settlement Agreement.

Recall that Vaso and Kelly Drye had previously entered into the Kelly Drye Fee Agreement under which Kelly Drye was to receive (a) 100% of it fees and (b) 25% of any remaining recovery after the payment of its fees.   Under the Kelly Drye Fee Agreement, Kelly Drye would have received $1,833,000 out of the $2.5 million in proceeds of the Robinson & Cole Settlement Agreement - leaving $667,000 for Vaso.  A few days after Vaso and Robinson & Cole executed the Settlement Agreement, Vaso and Kelly Drye entered into a Settlement Agreement By and Between Vaso Active Pharmaceuticals, Inc. and Kelly Drye & Warren, LLP (the "Kelly Drye Settlement Agreement").[26]

Under the Kelly Drye Settlement Agreement, "[o]f the $1,883,000 of the Vaso Settlement Amount that Kelley Drye is entitled to retain pursuant to the Fee Agreement, Kelley Drye shall (1) accept $595,000 payment, in full satisfaction of the fees and other charges owing to it by [Vaso and] . . . (3) direct Robinson Cole to make payment of the remainder of the Vaso Settlement Amount, in the amount of $1,905,000, directly to the Company, *"acknowledging that [Vaso] intends to pay $904,000, as part of the conditions of [the Kelly Drye Settlement Agreement] to [Masiz and Frattaroli] in respect of the [Accrued Wages]."*[27]  It further provides that "[i]n the event that the payments to Kelley Drye *or the Employees* are challenged on the basis of the Security Agreement [with the

---

[26] Opposition, Exh. A (Settlement Agreement By and Between Vaso Active Pharmaceuticals, Inc. and Kelley Drye & Warren LLP) (D.I. 13).

[27] The Kelley Drye Settlement Agreement defined "Employee Claims" as "outstanding payments for salary and wages earned by Masiz and Frattaroli.  Kelley Drye Settlement Agreement at p. 2. (emphasis added).

Noteholders], the reduced payment Kelley Drye is accepting pursuant to this Settlement and the reduced amount of Employee Claims agreed to herein shall become null and void and each party, respectively, shall be permitted to assert its entitlement to the full amount (1) due pursuant to the terms of the Fee Agreement or (2) of the Employee Claims."[28]

Under the Kelly Drye Settlement Agreement, the proceeds of the Robinson & Cole Settlement Agreement were to flow through Debtor into the hands of Defendants. Importantly: (a) only Robinson & Cole and Debtor are parties to the Robinson & Cole Settlement Agreement; and (b) only Debtor and Kelly Drye are parties to the Kelly Drye Settlement Agreement.  In addition, the Kelly Drye Settlement Agreement was not executed by Vaso.  The sole signatory is Kelly Drye.[29]

Vaso received its $1,905,000 in settlement proceeds from Robinson & Cole on December 29, 2009 (the date of the Kelly Drye Settlement Agreement).  Vaso immediately paid $598,000 to Masiz and $306,000 to Frattaroli on account of the Accrued Wages, which amounts included interest at 10% APR.  Vaso subsequently (but prior to the Petition Date) paid $178,363 to Masiz and $16,827 to Frattaroli for "regular payment of wages" that accrued after the December 29th payments.  At this time, virtually all of the cash in Debtor's possession came from the proceeds of the Robinson & Cole settlement.

---

[28] Kelley Drye Settlement Agreement at ¶¶ 2-3.

[29] *Id.* at p. 6

Meanwhile, at the time this money was going in and out of Vaso's coffers, Frattaroli understood that Vaso did not have the ability to pay its creditors in full:

> Q. At the time you received funds in December 2009 from the Robinson & Cole settlement proceeds, you understood that Vaso did not have the fund to pay all of its creditors, correct?
>
> A. At that time, it was unable to pay all of its creditors 100 percent.
>
> Q. Right.  But you decided that you should be paid in lieu of other creditors, correct?
>
> * * *
>
> A. Yes, I did.
>
> Q. Now, did you believe at this point that Vaso's product line and its license didn't have any reasonable prospects of generating enough money to pay you back?
>
> . . .
>
> A. Not as of the date that we paid.[30]

To review, of the $2.5 million paid by the Robinson & Cole in the settlement of the Robinson & Cole Litigation, $598,000 went to Masiz, $306,000 to Frattoli and $595,000 to Kelly Drye - totaling $1.5 million and leaving $1.0 million for the Debtor's estate.  After the subsequent payments of $178,363 and $16,927 were made to Masiz and Frattaroli, respectively, Vaso was left with $804,810 of the $2.5 million settlement proceeds.

## SUMMARY JUDGMENT STANDARD

The summary judgment standard is well known.  Rule 56(c) of the Federal Rules of Civil Procedure, made applicable to adversary proceedings by Rule 7056 of the Federal Rules of Bankruptcy Procedure, directs that summary judgment "should be

---

[30] Frattoli Depo. at 97:8-98:14 (May 4, 2010).

rendered if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law."[31]

When requesting summary judgment, the moving party must "put the ball in play, averring an absence of evidence to support the nonmoving party's case."[32]  In order to continue, the burden shifts to the nonmovant to identify "some factual disagreement sufficient to deflect *brevis* disposition."[33]  Not every discrepancy in the proof, however, is enough to forestall a properly supported motion for summary judgment; the "disagreement must relate to some genuine issue of material fact."[34]  In other words, the summary judgment standard "provides that the mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment."[35]

In order to demonstrate the existence of a genuine issue of material fact in a jury trial, the nonmovant must supply sufficient evidence (not mere allegations) for a reasonable jury to find for the nonmovant.[36]  The same principles apply in a bench trial

---

[31] Fed.R.Civ.P. 56.

[32] *Celotex Corp.*, 477 U.S. at 325.

[33] *Mesnick*, 950 F.2d at 822.

[34] *Id*.

[35] *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247-48 (1986).

[36] *United States v. Jamas Day Care Ctr. Corp.*, 152 Fed.Appx. 171, 173 (3d Cir. 2005) (quoting *Olson v. GE Astrospace*, 101 F.3d 947, 950 (3d Cir. 1996) (citing *Coolspring Stone Supply, Inc. v. American States Life Ins. Co.*, 10 F.3d 144, 148 (3d Cir. 1993))). *See also Mesnick*, 950 F.2d at 822. ("... 'genuine' means that the evidence about the fact is such that a reasonable jury could resolve the point in favor of the nonmoving party [and] 'material' means that the fact is one that might affect the outcome of the suit under the governing law").

where the judge is the ultimate trier of fact; the nonmovant must obviate an adequate showing to the judge to find for the nonmovant.[37]  At the summary judgment stage, the court does not "weigh the evidence and determine the truth of the matter;" rather, the court determines "whether there is a genuine issue for trial."[38]  A material fact is one which "could alter the outcome" of the case.  It is genuine when it is "triable," that is, when reasonable minds could disagree on the result.[39]  Importantly, all reasonable inferences must be drawn in favor of the nonmoving party[40] and any doubt must be read in favor of the nonmovant.[41]

The requirement that the movant supply sufficient evidence carries a significant corollary: the burden of proof is switched to the non-movant who "must present definite, competent evidence to rebut the motion."[42]  Such evidence "cannot be conjectural or problematic; it must have substance in the sense that it limits differing versions of the truth which a factfinder must resolve at an ensuing trial."[43]

---

[37] *Leonard v. General Motors Corp. (In re Headquarters Dodge)*, 13 F.3d 674, 679 (3d Cir. 1993) ("A fact is material if it might affect the outcome of the case, and an issue is genuine if the evidence is such that a reasonable factfinder [sic] could return a verdict in favor of the nonmovant."). *See also Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574 (1986) ("Where the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no genuine issue for trial").

[38] *Argus Mgmt. Group v. GAB Robins, Inc. (In re CVEO Corp.)*, 327 B.R. 210, 214 (Bankr. D. Del.2005) (quoting *Anderson*, 477 U.S. at 249).

[39] *Id*. at 210 (citing *Horowitz v. Federal Kemper Life Assurance Co.*, 57 F.3d 300, 301 (3d Cir. 1995)).

[40] *UPMC Health Sys. v. Metro. Life Ins. Co.*, 391 F.3d 497, 502 (3d Cir. 2004) (citing *Suders v. Easton*, 325 F.3d 432, 435 n.2 (3d Cir. 2003)).  *See also Interim Investors Comm. v. Jacoby*, 90 B.R. 777, 780 (W.D.N.C. 1988), *aff'd*, 914 F.2d 1491 (4th Cir. 1990); *In re Holzinger*, 89 B.R. 529, 530 (Bankr. E.D. Pa.1988); and *In re Pashi*, 88 B.R. 456, 457 (Bankr. N.D. Ga.1988).

[41] *In re Cantin*, 114 B.R. 339, 341 (Bankr. D. Mass.1990); and *In re Dempster*, 59 B.R. 453, 455 (Bankr. M.D. Ga.1984).

[42] *Id*. *See also Mesnick*, 950 F.2d at 822.

[43] *Mack v. Great Atl. & Pac. Tea Co.*, 871 F.2d 179, 181 (1st Cir. 1989).

Furthermore, evidence that "is merely colorable or is not significantly probative" cannot deter summary judgment.[44]  In response, "the non-moving party must adduce more than a mere scintilla of evidence in its favor;"[45] it cannot simply reassert factually unsupported allegations contained in its pleadings.[46]  In other words, the non-moving party must do more than "simply show that there is some metaphysical doubt as to the material facts."[47]  Conversely, in a situation where there is a complete failure of proof concerning an essential element of the nonmoving party's case, Rule 56(c) necessarily renders all other facts immaterial and mandates a ruling in favor of the moving party.[48]

## LEGAL ANALYSIS

1. **Were the funds at issue transferred to Masiz and Frattaroli not fraudulent conveyances because the funds were "earmarked" for them and, thus, were never property of the estate?**

   Defendants have asserted a "global defense" to Plaintiff's attempt to recover the funds transferred to Defendants out of the Robinson & Cole settlement proceeds.  They argue that, even though the settlement proceeds were transferred to Debtor and immediately paid to Defendants, the payments they received from Debtor were not fraudulent conveyances because the funds were "earmarked" for them and never became Debtor's property.

---

[44] *Id. See also Anderson*, 477 U.S. at 249-50.

[45] *Id. See also Argus Management Group v. GAB Robins, Inc. (In re CVEO Corp.)*, 327 B.R. 210, 213 (Bankr. D. Del. 2005).

[46] *See, e.g., Big Apple BMW, Inc. v. BMW of N. Am.*, Inc., 974 F.2d 1358, 1363 (3d Cir. 1992).

[47] *PTC v. Robert Wholey & Co. (In re Fleming Cos.)*, Case No. 05-75117, 2006 WL 1423348, *1 n. 1 (Bankr. D. Del. May 17, 2006) (citing *Matsushita Elec. Indus. Co.*, 475 US at 586).

[48] *Celotex Corp.*, 477 U.S. at 317.

"The earmarking doctrine is entirely a court-made interpretation of the statutory requirement that a voidable preference must involve a transfer of an interest of the debtor in property. Under this doctrine, [when] funds are provided by [a] new creditor to or for the benefit of the debtor for the purpose of paying the obligation owed to [an existing] creditor, the funds are said to be 'earmarked' and the payment is held not to be a voidable preference."[49]  Importantly, "[the] funds are sometimes transferred to the creditor whose obligation is being satisfied, but . . . the doctrine may still apply where the debtor physically receives control of the funds but the debtor lacks dispositive control over the funds."[50]

Counter-intuitively, "the earmarking doctrine is not an affirmative defense under [Fed.R.Civ.P.] 8, but rather a challenge to the trustee's claim that particular funds are part of the bankruptcy estate . . . Where, as here, the trustee establishes that the transfer of the disputed funds was from one of the debtor's accounts over which the debtor ordinarily exercised total control . . . the trustee makes a preliminary showing of an avoidable transfer 'of an interest of the debtor' under [section] 547(b). The burden then shifts to the defendant in the preference action to show that the funds were earmarked."[51] Thus, in order for Defendants to avoid summary judgment in Plaintiff's

---

[49] *Schubert v. Lucent Technologies, Inc. (In re Winstar Communications, Inc.)*, 554 F.3d 382, 400 (3d Cir. 2009) (citations and internal quotations omitted).

[50] *AmeriServe Food Distribution, Inc.*, 315 B.R. at 30 (*quoting In re McLean Industries, Inc.*, 132 B.R. 247, 261 (Bankr.S.D.N.Y.1991), *reversed on other grounds* 30 F.3d 385 (2nd Cir.1994), *cert. denied sub nom., U.S. Lines Reorganization Trust, Successor to U.S. Lines (S.A.), Inc. v. U.S.*, 513 U.S. 1126, 115 S.Ct. 934, 130 L.Ed.2d 880 (1995)).

[51] *Id*. (citations and internal quotations omitted).

favor based upon the "earmarking" doctrine, Defendants must establish that there is a genuine issue of material fact that, if found in their favor, would satisfy their burden.

It is undisputed that the proceeds of the Robinson & Cole Settlement Agreement at issue were paid by Robinson & Cole to Debtor into one of Debtor's accounts over which Debtor ordinarily exercised total control.  It is further undisputed that those funds were immediately transferred from Debtor's account to Defendants.  Thus, the burden has shifted to Defendants and, in order for the earmarking doctrine to apply in this case, they must establish "(1) the existence of an agreement between [Robinson & Cole] and [Debtor] that the [proceeds of the Robinson & Cole Settlement Agreement] will be used to pay [the Accrued Wages of Defendants], (2) performance of that agreement according to its terms, and (3) the transaction viewed as a whole ... does not result in any diminution of [Debtor's] estate."[52]

Defendants argue that the Kelley Drye Settlement Agreement is the operative agreement through which the earmarking doctrine applies in this case.  More specifically, they argue that the Kelley Drye Settlement Agreement provides that the transfers were to be paid to Defendants out of the proceeds of the Robinson & Cole Settlement Agreement and "but for" the Kelley Drye Settlement Agreement, Kelley Drye would not have taken a reduced fee and the money (including the amounts paid to Defendants) would have been retained by Kelley Drye in satisfaction of Debtor's legal bill.  Defendants' summary and interpretation of the Kelly Drye Settlement

---

[52] *Id.* at 400 (citations and internal quotations omitted).

Agreement must be considered accurate for purposes of this motion.  But, that is neither here nor there.

Defendant's argument fails as the Kelly Drye Settlement Agreement is *not* the operative agreement.  Indeed, no agreement exists that meets the test for applying the earmarking doctrine.  The very first element of the earmarking doctrine's three part test is: "the existence of an agreement between the new lender and the debtor that the new funds will be used to pay a specified antecedent debt."  Applied to the facts in this case, it requires: "the existence of an agreement between [Robinson & Cole] and [Debtor] that the [proceeds of the Robinson & Cole Settlement Agreement] will be used to pay [the Accrued Wages of Defendants]."

Robinson & Cole is not a party to the Kelly Drye Settlement Agreement.  Thus, that agreement cannot be the basis for applying the earmarking doctrine.  The only agreement between Robinson & Cole and Debtor is the Robinson & Cole Settlement Agreement resolving the Robinson & Cole Litigation.  But, that agreement is silent regarding the disposition of the proceeds of the settlement.  Indeed, it does not even mention the Kelly Drye Settlement Agreement.[53]  The sole provision of the Robinson & Cole Settlement Agreement relating to the disposition of the settlement proceeds provides that "[b]y no later than December 31, 2009, [Robinson & Cole] will cause $2,500,000 to be delivered by wire transfer to [Vaso], provided that [Robinson & Cole's] attorneys have received the executed Settlement Documents from [Vaso] by that

---

[53] That is not surprising since the Kelly Drye Fee Agreement was entered *after* the Robinson & Cole Settlement Agreement.

time."[54]  "Settlement Documents" is a defined term in the Robinson & Cole Settlement Agreement and neither the Kelly Drye Fee Agreement nor the Kelly Drye Settlement Agreement are included.

The terms of the Robinson & Cole Settlement Agreement, the Kelly Drye Fee Agreement, and the Kelly Drye Settlement Agreement are clear and unambiguous. Thus, Defendants cannot establish a genuine issue of material fact sufficient to rebut Plaintiff's *prima facie* case.  As such, as a matter of law, the earmarking doctrine is inapplicable in this case and Defendant's argument to the contrary is rejected by the Court.

**2. Were the transfers to Defendants by Vaso – which was allegedly controlled by Masiz and Frattaroli – made with the actual intent to hinder, delay and defraud creditors?  More specifically, were Defendants in a position to dominate or control Debtor's disposition of property such that the intent to hinder, delay, or defraud creditors may be imputed to Debtor rendering the transfers fraudulent?**

In Count II and Count V of the Complaint, Plaintiff seeks to recover Debtor's payments to Masiz and Frattaroli as having been made with the intent to hinder, delay and defraud its creditors.  More specifically, in Count II, Plaintiff seeks recovery of the payments under the federal fraudulent conveyance law set forth in section  548(a)(1)(A) of the Code.  In Count II, Trustee relies on section 544(b)(1) of the Code  to  seek recovery of the transfers as fraudulent conveyances under state law, i.e., section 1304(a)(i) of Title 6 of the Delaware Code.

---

[54] Settlement Agreement ¶3.

"Section 548(a)(1) of the Code grants a trustee [or DIP] the power to avoid any transfer by a debtor of an interest in property [or any obligation incurred by the debtor] made within two years before the filing of a bankruptcy petition if the transfer was actually or constructively fraudulent.    Under section 548(a)(1)(A), transfers or obligations incurred by a debtor may be avoided if made with actual intent to hinder, delay or defraud a past or future creditor."[55]

Section 544(b)(1), in turn, empowers a trustee to avoid "any transfer of the debtor in property or any obligation incurred by debtor that is voidable under applicable law by a creditor holding an unsecured claim . . ."  The "applicable law" in this case is section 1304(a)(i) of Title 6 of the Delaware Code, which provides that "(a) A transfer made or obligation incurred by a debtor is fraudulent as to a creditor . . . if the debtor made the transfer and incurred the obligation: (1) With actual intent to hinder, delay or defraud any creditor or the debtor."

How does a legal fiction such as a corporation have an intent to do anything?  Of course, corporations act through people and, ultimately, their officers and directors. As such, in certain circumstances, which Plaintiff alleges arise here, a transferee's intent to hinder, delay, or defraud creditors may be imputed to a debtor so as to render a transfer fraudulent.[56]    There is a three-part test for determining whether the "imputation doctrine" is applicable.  "First, is that the controlling transferee possesses the requisite

---

[55] *In re Fedders N. Am., Inc.*, 405 B.R. 527, 544-45 (Bankr. D. Del. 2009) (citations omitted); 11 U.S.C. § 548(a)(1)(A).

[56] *Elway Co. v. Miller (In re Elrod Holdings Corp.)*, 421 B.R. 700, 709 (Del. Bankr. 2010) (*citing* 5 *Collier on Bankruptcy* ¶ 548.01 at 548-24 (Alan N. Resnick & Henry J. Somme eds., 15th ed. 2009)).

intent to hinder, delay, or defraud the debtor's creditors. Second, the transferee must be

in a position to dominate or control. And third, the pertinent domination and control

relates to the debtor's disposition of his property."[57]   In this case, the transferees are

Masiz and Frattaroli and the question is whether one or both of them had an intent to

hinder, delay or defraud Vaso's creditor and, if so, should it be imputed to Debtor.[58]

> **a. Did Defendants possess the requisite intent to hinder, delay, or defraud Debtor's creditors?**

"To avoid a transaction under section 548(a)(1)(A) [and/or section 544(b)(i) –

incorporating 6 Del. C. §1304(a)(i)], a plaintiff must show that the transaction was made

'with actual intent to hinder, delay or defraud' creditors.  Because direct evidence of

fraudulent intent is often unavailable, courts often rely on circumstantial evidence to

infer [actual] fraudulent intent."[59]

Searching for such circumstantial evidence, courts look to badges of fraud that

include, "but are not limited to: (i) the relationship between the debtor and the

transferee; (ii) consideration for the conveyance; (iii) insolvency or indebtedness of the

debtors; (iv) how much of the debtor's estate was transferred; (v) reservation of benefits,

control or dominion by the debtor over the property transferred; and (vi) secrecy or

concealment of the transaction.  The presence or absence of any single badge of fraud is

---

[57] *Elrod Holdings Corp.*, 421 B.R. at 710 (*citing Jasckson v. Mishkin (In re Adler, Coleman Clearing Corp.)*, 263 B.R. 406, 445 (S.D.N.Y. 2001)).

[58] *Id.*

[59] *Fedders N. Am., Inc.*, 405 B.R. at 545. *See also China Res. Products (U.S.A.) Ltd. v. Fayda Int'l, Inc.*, 856 F. Supp. 856, 863 (D. Del. 1994) (citations omitted) ("The Delaware Courts have construed the subjective prerequisite of 'actual intent' to mean that of the grantee as well as the grantor.  Since actual fraudulent intent is rarely susceptible to direct proof, it is normally proven by circumstantial evidence.")

not conclusive.  The proper inquiry is whether the badges of fraud are present, not whether some factors are absent.  Although the presence of a single factor . . . may cast suspicion on the transferor's intent, the confluence of several in one transaction generally provides conclusive evidence of an actual intent to defraud.  Additionally, a court may consider other factors relevant to the transaction."[60]

Plaintiff asserts that numerous badges of fraud are present in this case and they are discussed below.  Although identified in reference to 6 Del. C. §1304(b), they are applicable to both Count II and Count V of the Complaint.

---

[60] *Id*. at 545 (numerals in the original are here changed to roman numerals).  The Delaware Code lists similar badges of fraud for the Court's consideration:

> (1) The transfer or obligation was to an insider;
>
> (2) The debtor retained possession or control of the property transferred after the transfer;
>
> (3) The transfer or obligation was disclosed or concealed;
>
> (4) Before the transfer was made or obligation was incurred, the debtor had been sued or threatened with suit;
>
> (5) The transfer was of substantially all of the debtor's assets;
>
> (6) The debtor absconded;
>
> (7) The debtor removed or concealed assets;
>
> (8) The value of the consideration received by the debtor was reasonably equivalent to the value of the asset transferred or the amount of the obligation incurred;
>
> (9) The debtor was insolvent or became insolvent shortly after the transfer was made or the obligation was incurred;
>
> (10) The transfer occurred shortly before or shortly after a substantially debt was incurred; and
>
> (11) The debtor transferred the essential assets of the business to a lienor who transferred the assets to an insider of the debtor.

6 Del. C. § 1304(b)(1-11) (hereinafter referred to as the "Delaware Badges of Fraud").

### i. Delaware Badge of Fraud 1: The transfer or obligation was to an insider

One badge of fraud is that the transfer in question was made to an insider.[61] Defendants concede that, at the time of the transfers, Frattaroli was an insider of Debtor pursuant to section 101(31) of the Bankruptcy Code and 6 Del. C. § 1301(7)(b).[62] Defendants argue, however, that Masiz was not an "insider" as he was neither an officer nor director at the time of the transfers.

Pursuant to section 101(31) of the Bankruptcy Code, if a debtor is a corporation (as Vaso is), the term "insider" *includes*: (i) director of the debtor; (ii) officer of the debtor; (iii) person in control of the debtor; (iv) partnership in which the debtor is a general partner; (v) general partner of the debtor; or (vi) relative of a general partner, director, officer, or person in control of the debtor.[63]   As Masiz has not held the title of officer nor director of Debtor since 2004, he would only be an insider under the applicable statues if he was a "person in control of the debtor" at the time of the transfers.[64]  But, even if Masiz was not in control of Vaso, he may be a "non-statutory insider."  The Third Circuit has held that a person can be an insider even if he or she does not fit into one of the enumerated categories.  A finding of control is not necessary for an entity to be a non-statutory insider."[65]  "[R]ather, the question 'is whether there is

---

[61] 6 Del. C. §1304(b)(l).

[62] At the time of the transfers Frattaroli was CFO, CEO and President of Debtor.

[63] 11 U.S.C. § 101(31)(B).

[64] *Id.*

[65] *Schubert v. Lucent Technologies, Inc.* (*In re Winstar Communications, Inc.*), 554 F.3d 382, 396 (3d Cir. 2009) (citations omitted).  *Clear Thinking Group LLC v. Brightstar US, Inc.* (*In re KCMVNO, Inc.*), 08-10600 BLS, 2010 WL 4064832 (Bankr. D. Del. Oct. 15, 2010) (explaining *Winstar* as follows: "Lucent was not only able

25

a close relationship [between debtor and creditor] and ... anything other than closeness to suggest that any transactions were not conducted at arm's length.'"[66]

There are a number of facts in the record that would support a finding that Masiz was a person in control and/or a non-statutory insider at the time of the transfers.

● Masiz  was the former CEO of Vaso.[67]

● BioChemics controlled 77 percent of the voting interest in Vaso and Masiz was the majority shareholder of BioChemics.

● After the settlement of the lawsuit with the SEC, Vaso hired Masiz as a "strategic advisor" at the same pay he was receiving as CEO.[68]

● Mr. Abbe, a representative of Iroquois, testified that:

> My understanding of Vaso was that John Masiz basically ran the company, even though he couldn't have the title of CEO from [sic] SEC purposes, but that he controlled all aspects of the company.  . . . [H]e was basically the CEO without having the title . . . My contact person with everything having to do with the transaction, everything having to do with Vaso, always dealt with John Masiz.[69]

● Masiz negotiated the terms of the financing with the Noteholders.[70]

---

to negotiate and enforce extremely favorable contract provisions, but received benefits beyond those specifically bargained for in its contract.  The contractual and gratuitous benefits obtained by Lucent led the Third Circuit to determine that the parties' 'one-sided transactions refute any suggestion of arm's length dealing.'" (citing *Winstar*, 554 F.3d at 399)).

[66] *Winstar Communications, Inc.*, 554 F.3d at 396-97 (*quoting Anstine v. Carl Zeiss Meditec AG (In re U.S. Med., Inc.)*, 531 F.3d 1272, 1277 (10th Cir. 2008)).

[67] Opposition, *Affidavit of John J. Masiz in Support* [sic] *of Plaintiff's Motion for Summary Judgment* at ¶ 3 ("Masiz Aff.").

[68] Masiz Aff. at ¶ 5.

[69] Abbe Depo. at 110:7-111:4.

[70] *Id*. at 110:3-111:6 ("He might not have been the one signing the documents, because he couldn't, but I dealt with him.").

●  In April 2009, Masiz (and Frattaroli) submitted to the Vaso Board of Directors a "proposal regarding payment of bonus compensation" to themselves if there was a settlement of the Robinson & Cole Litigation.[71]

●  Masiz attended the Robinson & Cole mediation and participated in Vaso's decision to accept the $2.5 million settlement of the Robinson & Cole Litigation.

On the other hand there is evidence in the record supporting a finding that Masiz was not an insider at the time.

●  Vaso had an independent board of directors.[72]

●  The board of directors approved all transactions, "which could possibly be seen as significant."[73]

●  Masiz "oversaw Vaso's day-to-day operations. However, [Masiz] had no authority to bind Vaso without approval from the acting CEO or the Board of Directors, nor did [Masiz] have the authority to sign any documents on behalf of Vaso."[74]

As stated above, it is undisputed that Frattaroli is an insider.  There is conflicting evidence, however, as to whether Masiz had "sufficient authority over the debtor so as to unqualifiably dictate corporate policy and the disposition of corporate assets."[75] Importantly, in a summary judgment motion, the Court cannot consider the credibility of the witnesses to help resolve the conflicting evidence.  Thus, although the evidence

---

[71] Frattaroli Aff. at ¶ 19.

[72] *Id.* at ¶ 5.

[73] *Id.* at ¶ 7.

[74] Masiz Aff. at ¶ 6.

[75] *In re Global Aviation Holdings Inc.*, 12-40783 CEC, 2012 WL 3018064, *4 (Bankr. E.D.N.Y. July 24, 2012) (*quoting In re Borders Group, Inc.*, 453 B.R. 459, 469 (Bankr. S.D.N.Y. 2011)).

appears to weigh in favor of finding Masiz to be a person in control of Debtor and/or a non-statutory insider at the time of the transfers, there is a genuine issue of material fact as to this question.

### ii.  Delaware Badge of Fraud 3 – The transfers were concealed

It would be a badge of fraud in this case if the transfers to Masiz and Frattaroli were concealed from Vaso's creditors, which Trustee says occurred until approximately one month after the transfers were made.[76]   Mr. Abbe of Iroquois testified that the Robinson & Cole Litigation was the Iroquois Noteholders' only real asset:

> Q.     So if I understand you, it sounds like the main basis for your investment in Vaso was the chance that it would achieve a big victory in the lawsuit against Robinson & Cole; is that right?
>
> A.     I look at that as being our protection.  And if the product did well, then obviously that's more of an upside.  But I would think that the lawsuit was our protection.  Because that was our only real asset.[77]

Iroquois arguably had a first priority security interest in the entirety of the $2.5 million in proceeds from the Robinson & Cole settlement and almost certainly had one in the $1.905 million Debtor received after the payment of Kelly Drye's fees.  Nonetheless, Masiz and Frattaroli were paid without regard to Iroquois Noteholders' secured claim[78]

---

[76] 6 Del. C. §1304(b)(3).

[77] Abbe Depo. at 64:16-67:2.  *See also* Abbe Depo. at 107:18-108:11; Kulick Depo. at 72:3-17 and 76:19-23.

[78] *See* Kulick Depo. at 68:24, 25-29-69:2-12.  *See also* Abbe Depo. at 102:32-103:3 (" . . . I expected to get paid when the company got the money.  I was senior secured.  I didn't expect management to take out salaries for themselves.").

and Frattaroli did not inform Iroquois that the transfers had been made until January 2010 (or later).[79]

Defendants respond that Frattaroli contacted Iroquois regarding the proposed settlement of the Robinson & Cole Litigation but asserts that "Vaso was not obligated to do so because Iroquois did not have a security interest in the [Robinson & Cole] Litigation or its proceeds, Vaso proposed paying Iroquois approximately $700,000 of the [settlement proceeds] to partially pay down the Iroquois Loan."[80]  Frattaroli continues that he disclosed the "salient terms" of the Robinson & Cole Settlement Agreement and the Kelley Drye Settlement Agreement to Iroquois.

There is ample testimony that the claims against Robinson & Cole were part of the Iroquois asset base.  Abbe judged the "success" of Vaso in terms of whether the Noteholders would be re-paid, which could happen from the proceeds of the litigation.[81] Abbe spoke with an attorney at Kelley Drye regarding the Robinson & Cole Litigation prior to investing in Vaso.[82]  The Noteholders considered the Robinson & Cole Litigation as "our only real asset."[83]  There were discussion between Masiz and Abbe regarding the status of the Robinson & Cole Litigation and Abbe testified that Masiz used the litigation to entice Iroquois to loan additional funds.[84]  Prior to the

---

[79] Abbe Depo. at 114:1-14 (Mr. Abbe testified that his attorney told him of the Robinson & Cole settlement at the end of January, 2010).

[80] Frattaroli Aff. at ¶ 47.

[81] Abbe Depo. at 65:8-67:2.

[82] *Id*.  at 46:9-47:6.

[83] *Id*. at 66:21-67:2.

[84] *Id*. at 107:18-108:11.

settlement of the Robinson & Cole litigation, Frattaroli had a conversation with Mitchell Kulick of Iroquois about the proposed distribution of the settlement proceeds.  During that conversation Frattaroli explained that the Noteholders would receive $500,000 of the settlement funds, Kelley Drye would receive $575,000, and $900,000 would be used for the wage claim.  Per Kulick, Frattaroli explained that he wanted to pay the wage claim in full:

> because he was concerned in Massachusetts that there was individual liability for officers and directors who didn't make full payment on behalf of past wages due.  So the representation to me was not that this was money he was getting paid, or that – it was that employees had long since foregone their salaries and this was their claim and he wanted to avoid personal liability.[85]

Kulick continued that he told Frattaroli that the Noteholders had a senior secured interest in any Robinson & Cole settlement:

> I'm and lawyer and you're a lawyer so you might find this offensive, but there is no . . . way you're going to get 575,000 while we're getting 500,000.  We're the senior secured lender of this company and you're a general unsecured creditor.  You're a law firm.  You have a receivable.  I have a security interest in every aspect of this company, I've been having conversations with Joe Frattaroli for two and a half years where he's indicated to me that we were first dollars out, and we were money good.[86]

The record overwhelming supports a finding that Frattaroli and Masiz concealed the nature and existence of transfers from Debtor's creditors at the time the transfers were made.  There is no genuine issue of material fact to the contrary and the court finds that "Delaware Badge of Fraud 3" is applicable here.

---

[85] Kulick Depo. at 66:12-73:12.

[86] *Id.*  at 72:4-17.

### iii. Delaware Badge of Fraud 4 – Before the transfer was made, the debtor had been sued or threatened with suit

It would be a badge of fraud in this case if, prior to the transfer, Debtor had been sued or was threatened with suit relating to the disposition of the proceeds of any settlement of the Robinson & Cole Litigation.   On February 4, 2010, at approximately the same time Iroquois learned of the transfers, it filed suit against Debtor in the Supreme Court of New York, County of New York seeking, among other things, specific performance of the Security Agreement, which would require Vaso to turn over the Robinson & Cole settlement proceeds to Iroquois in full or partial repayment of the Notes.   But, the transfers occurred *five weeks earlier* than commencement of that litigation, *i.e.,* on December 29, 2009.   There is no evidence that Iroquois actually threatened suit against Debtor prior to the transfer.   Plaintiff has failed to show he is entitled to summary judgment as to "Delaware Badge of Fraud 4."

### iv. Delaware Badge of Fraud 5 – the transfers were substantially all of the debtor's assets

It would also be a badge of fraud here if substantially all of Debtor's assets were transferred to Defendants.   Under the Kelly Drye Fee Agreement, Kelly Drye received $595,000 directly from Robinson & Cole.   The remaining $1,905,000 was transferred to Debtor and $904,000 of that amount was immediately transferred by Debtor to Frattaroli and Masiz, leaving approximately $1 million for Debtor.   But,  Frattaroli and Masiz received an additional $195,000, leaving $805,000 to Debtor.   According to Debtor's schedules, its assets totaled $686,000 on the Petition Date.

Defendants argue that the transfers they received were not substantially all of Debtor's assets for two reasons.  First, they argue that "[w]hen the Board of Directors agreed to pay the Settlement Transfers, if the Debtor was successful in the [Robinson & Cole] Litigation, neither the Board of Directors nor the Defendants imagined that the Settlement Transfers would constitute a substantial percentage of the debtor's assets."[87] This argument misses the point.  The operative date of inquiry is the date of the transfers and, on that date, it was clear that the payments to Defendants were a significant portion of Debtor's assets.

Defendants' second argument is that that Debtor did not transfer substantially all its assets to Defendants because $904,000 is only 40% of the settlement proceeds.  Kelly Drye arguably had a security interest in the settlement proceeds and was going to receive payment of at least some of its fees.  So, for purposes of this point, the payment to Kelly Drye can be ignored.  In addition, Defendants received a total of $1,098,640 not just $904,000.  In that case, Defendants received $1,098,640 of $1,905.00 or 58% of the settlement proceeds, leaving Debtor with only $686,000 on the Petition Date.  Even if you include the entirety of the $2.5 million of the Robinson & Cole settlement proceeds Defendants received 44% of those proceeds.  Defendants argue that a transfer of anything less than 50% of Debtor's assets is not substantially all of those assets.  That cannot be the case.   The law is not "majority of," but, the more amorphous "substantially all."  One can easily imagine substantially all of a company's asset being less than a majority.  Consider a manufacturing company that transfers its largest

---

[87] *Id.*

operating division valued at 48% of the company's assets leaving behind a number of small, disparate, unrelated operations and cash. The company has fundamentally changed and, in that case, it must be that substantially all of its assets have been sold. Consider, also, a bankruptcy case where a debtor-in-possession sells 48% of its assets without receiving court approval under section 363 of the Code. Such a transaction would almost certainly be outside the course of business (if for no other reason than few companies are in the business of disposing of 48% of their assets) and, thus, avoidable as an unauthorized post-petition transfer under section 549 of the Code. No matter how you cut it, the payments to Frattaroli and Masiz in this case were of substantially all of Debtor's assets. Plaintiff is entitled to summary judgment on the existence of "Delaware Badge of Fraud 5."

### v. Delaware Badge of Fraud 7 – The debtor removed or concealed assets

As discussed above, Debtor concealed assets by not disclosing to Iroquois nor its other creditors the terms and amount of the proceeds from the Robinson & Cole Settlement Agreement; the terms and amounts of payments to Kelly Drye under the Kelly Drye Settlement Agreement; and the basis for and the amount of the payments from Debtor's assets to Frattaroli and Masiz. Plaintiff is entitled to summary judgment on the existence of "Delaware Badge of Fraud 7."

### vi. Delaware Badge of Fraud 8 – The value of the consideration received by the debtor was reasonably equivalent to the value of the transfers

It would be a badge of fraud if Debtor did not receive reasonably equivalent value for the transfers to Defendants.  Whether Debtor received reasonably equivalent value for the transfers is discussed in detail below.  For the reasons set forth in that discussion, there is a genuine issue of material fact as to the existence of "Delaware Badge of Fraud 8.

### vii. Delaware Badge of Fraud 9 – The debtor was insolvent

Lastly, the Trustee argues that the Debtor was insolvent at the time of the transfers, which Defendants concede.

* * *

Trustee seeks to recover Debtor's payments to Defendant as having been made with the actual intent to hinder, delay or defraud its creditors.  Debtor's intent is imputed from Defendants' intent.  In order to apply the imputation doctrine Plaintiff must satisfy three prongs, the first of which is whether Defendants themselves had the intent to hinder, delay or defraud Debtor's creditors.  Defendants' intent is gleaned from examining whether "badges of fraud" are present.  The Court has just analyzed seven badges of fraud that may be relevant to this case and determined that Plaintiff is entitled to summary judgment for five of them.  These are: (i) the transfer was to an

insider;[88] (ii) the transfers were concealed; (iii) the transfers were substantially all of Debtor's assets; (iv) Debtor removed or concealed assets; and (vi) Debtor was insolvent.

The Trustee concludes that the entry of summary judgment for the five badges of fraud discussed above conclusively shows that Masiz and Frattaroli had the intent to hinder, delay and defraud Debtor's creditors.    Defendants responds that they "continued to work for Vaso without compensation for several years in the hopes of preserving the value of the company in order to fully pay all of Vaso's creditors.  . . . This selfless act for the intended benefit of the Debtor and its creditors indicates that the Defendants possessed no actual intent to defraud."[89]

Defendants miss the point.  The question is not whether Defendants worked without salary with intent to hinder, defraud or delay Debtor's creditors. That would be a ridiculous finding.  The question is whether Defendants paid themselves ahead of Debtor's creditors with intent to hinder, delay or defraud those creditors.  The answer to that question is clearly "yes."  The five badges of fraud for which Plaintiff has been awarded summary judgment easily carry the day.  There is no genuine issue of material fact and Plaintiff is awarded summary judgment as to the first prong of the imputation doctrine.  Whether the remaining elements have been established is discussed below.

---

[88] Although Frattaroli is an insider, the Court found there is a genuine issue of material as to whether Masiz was an insider at that time of the transfers.

[89] Opposition, at p. 16 (citation omitted).

### b.  Were Defendants in a position to dominate or control Debtor?

"The second element of the *Adler* test is [whether] the transferee was in a position to dominate or control the transferor."[90]   When a transferee dominates or controls the transferor, attribution of that person's fraudulent intent to the transferor may be justified; the "property passes, for all practical purposes, from one hand to the other of the same person, ending with the intended transferee."[91]   "Cases imputing a transferee's intent to a transferor have typically involved sole shareholders of the transferor, with complete control of the transferor, transferring assets to themselves as transferee."[92]

Trustee asserts that, for several reasons, at the time of the transfers in December 2009, Defendants were in a position to dominate or control Debtor.  For example, Frattaroli was acting CEO, President and CFO with complete oversight of payments being made by Vaso.  Masiz founded Vaso and BioChemics and was the controlling majority shareholder of BioChemics, which, in turn controlled 77% of the voting interest in Vaso.  Masiz testified that he alone decided if BioChemics would make an intercompany advance to Vaso.[93]  Finally, as set forth above, Frattaroli was an insider of Debtor.

Defendants respond that, at all times relevant to the transfers, Debtor had an independent Board of Directors of which neither Frattaroli nor Masiz were members.

---

[90] *Elrod*, 421 B.R. at 711.

[91] *Id*. (quoting *In re Adler*, 263 B.R. 447-48).

[92] *Id*. at 712 (citations omitted).

[93] Complaint at Exh. A (Deposition of John Masiz, May 4, 2010 at 5:10, 16; and 58:5-9) ("Masiz Depo.").

Moreover, Masiz was not an officer of the Debtor and did not have the power to bind Debtor nor sign documents on its behalf.  In short, Defendants assert that, although they had significant roles in the management of the Debtor, their management did not rise to the level of "dominion and control."

Under *Elrod*, even a high degree of functional control of day-to-day operations is not sufficient to imput intent.[94]  Courts have required "formal, legal control as well as functional control."[95]  Based on the existence of an independent Board of Directors and Masiz's legal inability to bind Vaso there is a genuine issue of material fact as to whether Defendants dominated or controlled Debtor as that term is used under the imputation doctrine.  As with the question of whether Masiz was an insider, the bulk of the evidence weighs in favor of finding Defendants dominated and controlled Debtor but that evidence is not sufficient to support entry of summary judgment.

### c. Was the domination and control of Debtor by Defendants related to Debtor's transfer of property to Defendant?

The third prong of the imputation doctrine is whether the transferee's domination and control is sufficiently related to transferor's disposition of the property at issue.[96]  Trustee asserts that the Robinson & Cole Litigation was Vaso's largest asset and the $2.5 million in proceeds from the settlement of the Robinson & Cole Litigation were property of Debtor.  Moreover, Frattaroli approved all payments made by Debtor. He also testified that he paid himself knowing that there were not enough assets to pay

---

[94] *Elrod*, 421 B.R. at 712.

[95] *Id*.

[96] *Id*.

the other creditors.[97]  Frattaroli testified further that, as of December 29, 2009, Vaso had no other reasonable prospect of generating revenue to pay the Accrued Wages or other creditors.[98]

Defendants counter that the payments to Defendants were not related to any influence they had with Debtor because the transfers were approved by Vaso's independent Board of Directors, with the advice of counsel.[99]  Their defense begs the question of domination and control.  If Defendants are found under the previous prong to have dominated or controlled Debtor it means the existence of the "independent" Board of Directors was unable to wrest control over the transfers.  In such a case, there would be no question but that Debtor's payment to Defendants was directly related to Defendants' control.  Thus, in this case at least, this prong rises and falls with the previous.  As there is a genuine issue of material fact as to whether Defendants dominated or controlled Debtor there is a genuine issue of material fact as to whether that domination and control is related to the transfer.  If the former is true the latter is true and if the former is false the latter is false.  So, Plaintiff is not entitled to summary judgment on this element of the imputation doctrine.

* * *

As stated earlier, under Count II and V of the Complaint, Trustee seeks to recover Debtor's payments to Defendants as having been made with the actual intent to

---

[97] Frattaroli Depo. at 97:8-98:14.

[98] *Id*. at 98:7-14.

[99] *Id*. at ¶¶ 36 and 42.

hinder, delay or defraud its creditors.  Trustee asserts that Defendants' intent can be imputed to Debtor.  In order for that to occur, Trustee must establish that, at the time of the transfers, (i) Frattaroli and/or Masiz had an actual intent to hinder, delay or defraud Debtor's creditors; (ii) they were in a position to dominate or control Debtor; and (iii) their domination and control was sufficiently related to the transfers.

As discussed above, Plaintiff is entitled to summary judgment on the first prong but not the others.  As such, Plaintiff is not entitled to summary judgment that Debtor transferred the proceeds of Robinson & Cole settlement to Defendants with the actual intent to hinder, defraud or delay its creditors.  Plaintiff's motion for summary judgment on Count II and Count V of the Complaint is denied.

### 3.  Did Debtor make the transfers without receiving reasonably equivalent value while Debtor was insolvent?

In Count III, Count IV, and Count VI of the Complaint, Trustee seeks to recover the payments made to Defendants as being constructively fraudulent because they were made by Debtor without receiving reasonably equivalent value while Debtor was insolvent.  More specifically, in Count III and IV, Plaintiff seeks recovery under the federal fraudulent conveyance law set forth in Code sections 548(a)(1)(B)(i) and (ii) (I), (II) and (III); and 548(a)(l)(B)(iv), respectively.   In Count VI, Plaintiff relies on section 544(b) of the Code to seek recovery of the transfers as fraudulent conveyances under state law, *i.e.*, section 1305(a) of Title 6 of the Delaware Code.

The applicable sections of 548 of the Code and section 1305 of Title 6 of the Delaware Code are substantively identical.  In order to establish that a transfer was

constructively fraudulent under these statutes, "Plaintiff must show that (a) the debtor made the transfer or incurred the obligation without receiving reasonably equivalent value, and (b) regarding the debtor's financial condition, the debtor was either: (i) insolvent or became insolvent as a result of the transfer; (ii) engaged or was about to engage in a business or transaction for which its remaining assets were unreasonably small in relation to the business or transaction; (iii) intended to incur, or believed or reasonably should have believed that it would incur, debts beyond its ability to pay as they became due; or (iv) made the transfer to or for the benefit of an insider under an employment contract outside the ordinary course of business.

### a. Under the totality of the circumstances did Debtor receive reasonably equivalent value?

"The term 'reasonably equivalent value' is not defined by the Bankruptcy Code. Congress left to the courts the task of setting forth the scope and meaning of this term, and courts have rejected the application of any fixed mathematical formula to determine reasonable equivalence.  As the Third Circuit has noted, 'a party receives reasonably equivalent value for what it gives up if it gets roughly the value it gave.' [Courts] look to the 'totality of the circumstances' of the transfer to determine whether 'reasonably equivalent' value was given."[100]

Generally, this Court follows a two-step approach, first looking to whether "based on the circumstances that existed at the time of the transfer [or obligation] it was

---

[100] *Id*. at ¶ 39 (citations omitted).

'legitimate and reasonable' to expect some value accruing to the debtor."[101]  "Second, if the court finds that the debtor received any value, the court must engage in a fact-driven comparison between such value and the transfer or obligation sought to be avoided to determine 'whether the debtor got roughly the value it gave.' . . . To assess the reasonable equivalence of the transfer or obligation and the value received by the debtor, a court should 'look to the totality of the circumstances, including (1) the fair market value of the benefit received as a result of the transfer, (2) the existence of an arm's-length relationship between the debtor and the transferee, and (3) the transferee's good faith."[102]  "The purpose of the [fraudulent conveyance] laws is estate preservation; thus, the question whether the debtor received reasonable value must be determined from the standpoint of the creditors."[103]  Finally, the determination of reasonably equivalent value "is exacerbated in cases where ... the debtor exchanges cash for intangibles, such as services or the opportunity to obtain economic value in the future, the value of which is difficult, if not impossible, to ascertain."[104]

The preliminary question is whether it was legitimate and reasonable to expect Defendants to have provided some value to Debtor as a basis for receiving the transfers?  The answer is rather obviously yes, which leads to the question of whether

---

[101] *Official Committee of Unsecured Creditors v. CIT Group/Business Credit, Inc. (In re Jevic Holding Corp.)*, Adv. Case No. 08-51903, 2011 WL 4345204, at *8 (Bankr. D. Del 2011).

[102] *Id.*

[103] *Mellon Bank, N.A. v. Metro Communications, Inc.*, 945 F.2d 635, 646 (3d Cir. 1991).

[104] *Mellon Bank, N.A. v. Official Committee of Unsecured Creditors of R.M.L., Inc. (In re R.M.L., Inc.)*, 92 F.3d 139, 148 (3d Cir. 1996).  *See also EBC I, Inc. v. America Online, Inc. (In re EBC I, Inc.)*, 356 B.R. 631, 641-42 (Bankr. D. Del. 2006).

Debtor, in fact, received some benefit from Defendants' service.  Trustee argues Debtor did not.

In April 2006, Vaso stopped paying Masiz his $175,000 yearly salary due under his employment contract.   In May 2008, Vaso ceased paying Frattaroli.   Frattaroli testified that the Board of Directors determined "that $175,000 per year plus a $50,000 [annual] bonus was an appropriate valuation of the services" Masiz and he were providing to Vaso without pay.  The $904,000 payment to Defendants in December 2009 consisted of a payment to Masiz of $598,000 and to Frattaroli of $306,000.   These amounts were the foregone salary and bonuses discussed above plus interest at 10% APR.  Vaso subsequently paid $178,363 to Masiz and $16,827 to Frattaroli.  It is unclear from the record how those amounts were calculated and why Masiz received such a large payment in comparison to Frattaroli.

Trustee makes numerous assertions in support of his argument that Debtor did not receive any benefit (let alone $904,000 worth) from Defendants' services.

- From 2008-2010 when both Masiz and Frattaroli were running the company and foregoing salary, Vaso had gross income of $80,000 and losses in the millions.

- From 2007 onward, Vaso's business operations were basically defunct, losses continued in the millions, and Vaso existed solely to pursue the Robinson & Cole Litigation.

- After the settlement of the Robinson & Cole Litigation and the transfers to Defendants, Vaso was left with assets of approximately $686,000 and liabilities of almost $9 million.

- Two weeks after the transfers were made to Defendants, Vaso hired Chapter 11 counsel with $350,000 of the remaining settlement proceeds.[105]

Defendants respond that Debtor received some benefit in exchange for the transfers as Defendants provided services to the Debtor for several years without receiving *any* compensation for such services.  That there was value received, they argue, is supported by the decision of the independent Board of Directors, with the guidance of outside consultants and counsel, to pay $175,000 per year with an annual bonus of $50,000.  Presumably an independent board would not approve such salaries unless it believed the company was receiving value.  Defendants further note that the valuation of Debtor's services was on the lower end of a range of salaries paid by other companies in the greater Boston area, implying Vaso was actually under paying Defendants.

It is clear from the record that Debtor received *some* benefit from the services provided by Masiz and Frattaroli in the years they forwent their salary.  Thus, the Court must turn to whether the value of those services was reasonably equivalent to the $904,000 Debtor paid for them.

---

[105] Frattaroli Depo. at 97:12-98:6.

### i. Did Debtor receive fair market value for the transfers?

The Court must determine whether Vaso received "fair market value" for paying Defendants $904,000 from the settlement proceeds (approximately 36%) to run a business that had essentially stopped operating except to pursue litigation. As touched on above, however, Frattaroli testified that he hired an independent consultant who opined that Frattaroli "should expect to make approximately $175,000 at Vaso with an additional bonus of $50,0000 [sic] per year." Frattaroli further testified that "Vaso's independent Board of Directors reviewed the consultant's report and determined that $175,000 per year plus a $50,000 bonus was an appropriate valuation of the services that Masiz and [Frattaroli] rendered to Vaso." No additional, corroborating evidence - such as board minutes or a copy of the consultant's report - is before the Court. But, Plaintiff has not submitted any evidence in support of its position other than to argue it just can't be that the management of a debtor that never turned a profit, assessed $17 million in losses through its history, and had $686,000 in assets and $8 million in liabilities on the Petition Date can be worth anything like what Defendants received. Plaintiff's argument has a certain visceral appeal but it is not evidence. There is a genuine issue of material fact as to whether the services provided by the Defendants was "roughly equivalent"[106] to $904,000.

### ii. Were the transfers made at arms' length?

The second prong of the "reasonably equivalent value" test is whether the payments to Defendants were made at arms' length. The Third Circuit has stated that a

---

[106] *BFP v. Resolution Trust Corp.*, 511 U.S. 531, 540 n. 4 (1994).

"seller's pursuit of alternative transaction partners and selfish negotiations for financial concessions epitomize arm's length bargaining, . . . but where a seller negotiates solely for the benefit of the surviving entity or in total disregard of the price, the transaction cannot be considered at arm's length."[107]

There is conflicting evidence as to whether the negotiations between Debtor and Defendants related to Defendants' salary and the decision to pay the Accrued Wages were conducted at arms' length. For example, Frattaroli is an insider but there is a genuine issue of material fact as to whether Masiz is an insider. Frattaroli testified the Board of Directors set Defendants' compensation after considering a consultant's report but there is no collaborating evidence and the Court cannot judge Frattaroli's credibility on a paper record. In short, there is a genuine issue of material fact as to whether negotiations were conducted at arms' length.[108]

### iii. Did Defendants act in good faith?

The third prong of the "reasonably equivalent value "test is whether Defendants acted in good faith. "The Bankruptcy Code does not define either 'good faith' or 'good faith transferee.' *Collier* has observed that because the question of good faith arises in varied circumstances, the term defies an easy or precise definition. Accordingly, courts generally evaluate good faith defenses on a case-by-case basis. This requires the court examine what the transferee objectively "knew or should have known," such that a

---

[107] *Jeanes Hosp. v. Sec'y of Health & Human Services*, 448 F. App'x 202, 206 (3d Cir. 2011) (citations omitted).

[108] *UPMC-Braddock Hosp. v. Sebelius*, 592 F.3d 427, 434 (3d Cir. 2010) (a finding of "arms' length" is a "fact-intensive inquiry.")

transferee does not act in good faith when it has sufficient knowledge to place it on inquiry notice of the voidability of the transfer."[109]

Defendants did not act in good faith in causing Debtor to transfer the settlement proceeds of Robinson & Cole Litigation to themselves. The question is whether, at the time of the transfers, Defendants were on inquiry notice of the voidability of the transfers. Frattaroli testified that at the time of the transfer he *knew* that Vaso was unable to pay all of its creditors 100 percent.[110] Both Defendants knew that the Robison & Cole Litigation and, thus, its settlement was the Debtor's only substantial asset.[111] Both Defendants knew that there was, at the very least, a dispute about whether the Noteholders had a senior secured interest in the settlement proceeds.[112] There is no genuine issue of material fact on these issues and, as a matter of law, Defendants lacked good faith in connection with the transfers.

### b. Was Debtor insolvent at the time of the transfers?

Pursuant to § 548(a)(1)(B), a plaintiff establish the lack of reasonably equivalent value *and one of four* alternative additional elements: the debtor (i) was insolvent or became insolvent as a result of the transfer; (ii) was engaged or was about to engage in a business or transaction for which its remaining assets were unreasonably small in relation to the business or transaction; (iii) intended to incur, or believed or reasonably

---

[109] *Hobler v. Dolchin Slotkin & Todd, P.C. (In re Am. Rehab & Physical Therapy, Inc.)*, 04-14562, 2006 WL 1997431 (Bankr. E.D. Pa. May 18, 2006) (citations omitted).

[110] Frattaroli Depo. at 97:12-98:6.

[111] *Id.* at 98:7-14; Masiz Aff. at 71:18-72:1

[112] Kulick Depo. at 72:4-17.

should have believed that it would incur, debts beyond its ability to pay as they became due; or (iv) made the transfer to or for the benefit of an insider under an employment contract outside the ordinary course of business.

Under section 1304(a)(2) (a) or (b), of Title 6 of the Delaware Code, Plaintiff must establish lack of reasonably equivalent value and the one of two alternative elements. These are whether Debtor: (i) intended to incur, or believed or reasonably should have believed that it would incur, debts beyond its ability to pay as they became due; or (ii) made the transfer to or for the benefit of an insider under an employment contract outside the ordinary course of business.

Insolvency satisfies both the federal and state tests in this instance.  The term insolvent is defined in the Bankruptcy Code generally to mean a "financial condition such that the sum of such entity's debts is greater than all of such entity's property, at a fair valuation."[113]  In evaluating the fair value of a company's assets for purposes of determining solvency, the appropriate premise of value must be applied: either the going concern premise of value or the liquidation premise of value.[114]  Defendants concede that Debtor was insolvent at the time the transfers were made.[115]  As such, 11 U.S.C. § 548(a)(1)(B)(ii) and 6 Del. C. § 1304(a)(2) have been met.

---

[113] 11 U.S.C. § 101(32)(A).

[114] *Travellers Int'l AG v. Trans World Airlines, Inc. (In re Trans World Airlines, Inc.)*, 134 F.3d 188, 193 (3d Cir. 1998) (finding that fair valuation of TWA's assets required choice between going concern and liquidation premises of value*); EBC I, Inc. v. America Online, Inc. (In re EBC I, Inc.)*, 380 B.R. 348, 355 (Bankr. D. Del. 2008) *aff'd*, 400 B.R. 13 (D. Del. 2009) aff'd, 382 F. App'x 135 (3d Cir. 2010); *American Classic Voyages Co. v. JP Morgan Chase Bank (In re American Classic Voyages Co.)*, 367 B.R. 500, 508 (Bankr. D. Del. 2007) ("In determining a 'fair valuation' of the entity's assets, an initial decision to be made is whether to value the assets on a going concern basis or a liquidation basis.").

[115] Opposition at pp. 26-27.

As Defendants have conceded insolvency the other, alternative bases for establishing constructive fraud need not be discussed.  Nonetheless, in the interests of completeness, the Court will briefly address them.  The second alternative element is the unreasonably small capital test, which analyzes whether, at the time of the transfer, the company had insufficient capital, including access to credit, for operations.[116] Similarly, the third alternative element test is whether the debtor "intended to incur, or believed that the debtor would incur, debts that would be beyond the debtor's ability to pay as such debts matured . . . ."[117]  The existence of both of these alternative elements (insufficient capital and intent to incur debt beyond the debtor's ability to pay) is established by Frattaroli's statements at his deposition that when the transfers were made he and Masiz knew that there was not enough money to pay Debtor's other creditors.[118]

The final alternative element is whether the transferee was an insider or incurred such obligation to or for the benefit of an insider under an employment contract and not in the ordinary course of business.  Frattaroli was an insider at the time of the transfers but there is a genuine issue of material fact as to whether Masiz was one.  In addition, it is clear from the record that the transfers were outside the ordinary course of business.

---

[116] 11 U.S.C. § 548(a)(1)(B)(ii)(II).  *EBC I, Inc. v. AOL Online, Inc.* (*In re EBC I, Inc.*), 380 B.R. 348, 359 (Bankr. D. Del.  2008) *aff'd*, 400 B.R. 13 (D. Del. 2009) *aff'd*, 382 F. App'x 135 (3d Cir. 2010) (citations omitted).  *See also Moody v. Sec. Pac. Bus. Credit, Inc.*, 971 F.2d (3d Cir. 1992) ("[I]t was proper for the district court to consider availability of credit in determining whether [the debtor] was left with an unreasonably small capital.").  See also  6 Del. C. §1304(a)(2) (the debtor "[w]as engaged or was about to engage in a business or a transaction for which the remaining assets of the debtor were unreasonably small in relation to the business or transaction.").

[117] 11 U.S.C. § 548 (a)(1)(B)(ii) and 6 Del. C. § 1304(a)(2).

[118] Frattaroli Depo.  at 97:8-98:14.

It is not clear, however, whether either or both Defendants had an employment contract with Debtor at the time of the transfers. Thus, Plaintiff is not entitled to summary judgment on this alternative element.

* * *

Under Counts III, IV and VI, Trustee seeks to recover the payments made to Defendants as being constructively fraudulent because they were made by Debtor without receiving reasonably equivalent value while Debtor was insolvent. Debtor has established that three of the four alternative elements necessary to establish the second prong of the reasonably equivalent value test are met – insolvency, insufficient capital and intent to incur debt beyond the debtor's ability to pay. As any of the three are sufficient to meet the test, Plaintiff is entitled to summary judgment on this prong.

As to the first prong, Plaintiff must establish that, under the totality of the circumstances, Debtor did not receive reasonably equivalent value. This, in turn, requires Plaintiff to establish (i) Debtor did not receive fair market value in exchange for the transfers, (ii) the transfers were not made at arms' length; and (iii) Defendants did not act in good faith. Although Plaintiff has established Defendants did not act in good faith, there is a genuine issue of material fact as to fair value and arms' length.

Thus, Plaintiff has not met his burden and the motion for entry of summary judgment is denied as to Count II, Count IV and Count VI.

### 4. Were the transfers constructively fraudulent?

In Count VII, Plaintiff relies on section 544(b) of the Code to seek recovery of the transfers to Defendants as fraudulent conveyances under state law, *i.e.*, section 1305(b)

of Title 6 of the Delaware Code. It is Plaintiff's burden to establish the transfers were made for the benefit of an insider for an antecedent debt when the Debtor was insolvent and the transferee knew the Debtor was insolvent.

### a. Were Defendants insiders?

Frattaroli was an insider of the Debtor at the time of the transfers but there is genuine issue of material fact as to whether Masiz was one.

### b. Were the transfers on account of an antecedent debt?

"Debt" is defined in the Bankruptcy Code as a "liability on a claim."[119] "Claim" is defined as any "right to payment, whether or not such right is reduced to judgment, liquidated, unliquidated, fixed, contingent, matured, unmatured, disputed, undisputed, legal, equitable, secured, or unsecured."[120] "These terms are coextensive and construed broadly. Thus, 'when a creditor has a claim against a debtor—even if the claim is unliquidated, unfixed, or contingent—the debtor has incurred a debt to the creditor.' A debt is antecedent for the purposes of section 547(b) if it was incurred before the debtor made the allegedly preferential transfer. In addition, a debt is deemed to have been incurred 'on the date upon which the debtor first becomes legally bound to pay.'"[121]

Defendants argue that there was no antecedent debt because Debtor did not become legally bound to pay the Defendants for their past employment until Debtor

---

[119] 11 U.S.C. § 101(12).

[120] 11 U.S.C. § 101(5).

[121] *Peltz v. New Age Consulting Services, Inc.*, 279 B.R. 99, 102 (Bankr. D. Del. 2002) (internal quotations and citations omitted).

received the proceeds of the Robinson & Cole Litigation settlement.[122]    Defendants

continue that once Debtor received the settlement proceeds, Debtor immediately made

the transfers to Defendants.[123]    Trustee responds that the Accrued Wages were on

Vaso's books from 2006 to November 30, 2009.[124]

At this time, the Court pauses to discuss Defendants' incongruous position as to

whether the transfers were in return for their services for which they were not paid.

Although the amount of the transfers was pegged to what their salary (allegedly)

should have been (with the additional 10% interest), Defendants have also said (when

convenient) that Vaso was not accruing the Defendants' wages and that the transfers

were as a result of a successful settlement of the Robinson & Cole Litigation.[125]    The

---

[122] *See* Frattaroli Aff. at ¶¶ 9-11, and 19-22.

[123] Frattaroli states in his affidavit neither he nor the Board of Directors would allow $900,000 of unpaid wages to accrue because of the amorphous (and uncited) Massachusetts law that would hold directors and officers individually liable for a company's failure to pay wages with the potential of treble damages. Frattaroli Aff. at ¶ 14-15.    However, this testimony is in direct contravention to Frattaroli's deposition transcript.    *See* Frattaroli Depo. 92:14-93:4; 93:6-95:1.    However, there is evidence of the accrual: Vaso's 10Q, dated Sept. 30, 2008 (Motion at Exh. 4, bate stamp PL000055).    Under Mass. Gen. Laws Ann. ch. 149, § 148-159C (West) of the Wage Act (the "Wage Act"), "[t]he president and treasurer of a corporation and any officers or agents having the management of such corporation shall be deemed to be the employers of the employees of the corporation within the meaning of this section," and therefore are jointly and severally liable with the corporation for the payment of the unpaid wages. Mass. Gen. Laws Ann. ch. 149, § 148 (West).    *See Bisson v. Ptech, Inc.*, CIV.A. 02-2117, 2004 WL 2434638, *1-2 (Mass. Super. Oct. 19, 2004). Although, the Massachusetts Court "has applied the Wage Act to corporate executives as well as lower level employees, the Court has interpreted the statute narrowly, limiting its application to the payment of ordinary wages and wage equivalents." *Fitzgerald v. Chipwrights Design, Inc.*, 051050, 2005 WL 1869151, *2 (Mass. Super. July 1, 2005) (citations omitted).    However, the state court has held that if the compensation is triggered by a contingency, rather than wages to be paid for hours worked, then the Wage Act does not apply.    *Id.* at *3.    In any event, it is not clear whether the Wage Act would have applied to Frattaroli and Masiz under the circumstances.

[124] Frattaroli Depo. at 89:9-14, 90:12-24, 92:15-95:24.

[125] *Compare* Response Brief at p. 4 ("During this time, the Defendants were also ***not*** accruing such unpaid wages.    Pursuant to Massachusetts law, directors and officers are individually liable for a company's failure to pay wages and treble damages can be assessed.    As such, neither the Board of Directors, nor Frattaroli would have allowed over $900,000 of unpaid wages to accrue." (emphasis added; citations omitted)) and Frattaroli Aff. at ¶¶13, 14, and 15; *with* Frattaroli Depo. at 90:12-96:8 ("Q.  .  .  .  The

record clearly supports that while the transfers were paid at the time of the settlement that was simply because that was the first time Debtor had sufficient funds to make the transfers.  The right or basis for payment, however, was based on the accrual of unpaid wages.  Thus, Masiz and Frattaroli both had a *claim* against Debtor at the time of the transfers.  Whether that claim would have been allowed in whole or in part or how it would be classified is irrelevant.

### c.  Was Debtor insolvent at the time of the transfers?

Debtor was insolvent at the time of the transfers.

### d.  Did Defendants know Debtor was insolvent at the time of the transfers?

Defendants knew at the time of the transfers that Defendant was insolvent.[126]

* * *

Plaintiff has established that the transfers were made on account of an antecedent debt while Debtor was insolvent and Defendants knew Debtor was insolvent.   In addition, Plaintiff has established Frattaroli was an insider at the time of the transfers.  As to Masiz, however, there is a genuine issue of material fact as to whether he was an insider.  Thus, summary judgment shall be entered against Frattaroli as to Count VII.  Summary judgment as to the elements other than the insider requirement shall be entered against Masiz but must be denied as to Count VII as a whole.

---

distributions that were made to you and Mr. Masiz were on account of accrued salary; is that correct? A. Yes.  It was accrued and unpaid wages."); Masiz Depo. at 88:15-89:17 ( Q. . . . what, if anything, was said on that subject before you received it [the Transfer]? A.  We're accruing interest for you over the last – you know, since – over the last three years of not taking a salary. Q. Well, the interest wasn't being accrued on the books of Vaso, was it? A. No. No.").

[126] Frattaroli Depo. at 97:1-98:14; Frattaroli Aff. at ¶ 37; Masiz Depo. at 84:18-85:1.

**5.  Are the transfers avoidable under section 550 of the Code?**

Section 550 of the Code provides that "to the extent that a transfer is avoided under section 544 . . . [or] 548 . . . of this title, the trustee may recover . . . the property transferred . . . from the initial transferee of such transfer or the entity for whose benefit such transfer was made."[127]   Under section 550(b)(1), however, a trustee may not recover from "a transferee that takes for value, including satisfaction . . . of a present or antecedent debt, in good faith, and without knowledge of the voidability of the transfer avoided."[128]

This test is written in the negative.   Provided that liability is satisfied under section 548, the transfers are avoidable *unless* (a) they were not made for the benefit of Defendants; *and* (b) Defendants did not receive the transfers in satisfaction of a debt, were not acting in bad faith and had no knowledge of the avoidability of the transfers. All of these elements have been discussed above and have been affirmatively established by Trustee.

**a.  Were the transfers were made for the benefit of Defendants?**

Defendants concede that they received the transfers.

**b.  Did Defendants receive the transfers in satisfaction of a present or antecedent debt, in good faith, and without knowledge that the transfers may be avoided?**

The transfers were on account of antecedent debt;  Defendants were not acting in good faith; and Defendants received the transfers.

---

[127] 11 U.S.C. § 550(a)(1).

[128] *Id.*

To the extent that summary judgment is entered on any of the Counts discussed above, the transfers are avoidable under section 550 of the Code.

**6.  Assuming the transfers are avoidable for one or more of the reasons set forth above, is Plaintiff entitled to pre-judgment interest on the transfers from the date they were made?**

The Trustee requests summary judgment on his entitlement to pre-judgment interest.  The awarding of pre-judgment interest is within the discretion of the Court.[129]  The Code does not include a specific reference to prejudgment interest.[130]  However, "courts have relied on the word 'value' in [section] 550(a) as authorizing an interest award."[131]  The Court's exercise of its discretion to award pre-judgment interest "must be exercised according to law, which means that prejudgment interest should be awarded *unless there is a sound reason not to do so.*'"[132]  The Third Circuit has instructed that the Court must state a 'sound reason' to deny prejudgment interest.[133]

The Court has determined that the entry of summary judgment on some elements of the asserted Counts and on one of the Counts in its entirety.  In addition, the Court has determined that the earmarking doctrine is not applicable here.  The overriding theme of this case and this opinion is that Defendants acted with pre-meditated intent to pursue their own remuneration at the expense of Debtor's other creditors.  Whether certain Counts may or may not be established at this time or ever

---

[129] *Hechinger Inv. Co. of Delaware, inc. v. Universal Forest Products, Inc. (In re Hechinger Inv. Co. of Delaware, Inc.)*, 489 F.3d 568, 579 (3d Cir. 2007) (citations omitted).

[130] *Id.*

[131] *Id.*

[132] *Id.* at 580 (quoting *In re Milwaukee Cheese Wis., Inc.*, 112 F.3d 845, 849 (7th Cir. 1997)) (emphasis added).

[133] *Id.*

cannot hide the underlying facts.  Not only is there not a sound reason to deny Trustee pre-judgment interest there is a sound basis to award that interest.  Thus, pre-judgment interest shall be awarded in connection with any and all Counts for which liability is established.

## CONCLUSION

This has been a lengthy opinion.  The Court has discussed the earmarking doctrine and requests for summary judgment as to six separate Counts asserted against Defendants, the analysis of which required applying multiple legal tests with many sub-parts.  The Court has also discussed whether the transfers are avoidable under section 550 of the Code and whether pre-judgment interest should be awarded.

It is important to recall the procedural posture of the case – this is Plaintiff's motion for the entry of summary judgment.  In applying that standard the Court has determined that Plaintiff is entitled to summary judgment on certain elements of the applicable legal tests as well as on Count VII against Frattaroli in its entirety.  On the other side, the Court has denied summary judgment on certain elements of legal tests and, as a result, has denied entry of summary judgment on most of the Counts brought by Plaintiff.

The Court began this opinion with a series of questions that must be answered to determine whether entry of summary judgment is appropriate.  It closes by answering those questions and identifying whether Plaintiff's motion will be granted or denied based on those answers.  The ultimate rulings (as opposed to the legal tests and their sub-parts) are identified in bold.

| Question No. | | | Question | Count(s) | Summary Judgment in Plaintiff's Favor?[134] |
|---|---|---|---|---|---|
| **1.** | | | **Were the funds at issue transferred to Defendants not fraudulent conveyances because the funds were "earmarked" for them and, thus, were never property of the estate?** | **All** | **Yes** |
| **2.** | | | **Were Defendants in a position to dominate or control Debtor's disposition of property such that the intent to hinder, delay, or defraud creditors may be imputed to Debtor rendering the transfers fraudulent?** | **Counts II and V** | **No** |
| | a. | | Did Defendants possess the requisite intent to hinder, delay, or defraud Debtor's creditors? | | Yes |
| | | i. | Delaware Badge of Fraud 1: The transfer or obligation was to an insider | | Yes as to Farttaroli No as to Masiz |
| | | ii. | Delaware Badge of Fraud 3 – The transfers were concealed | | Yes |
| | | iii. | Delaware Badge of Fraud 4 – Before the transfer was made, the debtor had been sued or threatened with suit | | No |
| | | iv. | Delaware Badge of Fraud 5 – the transfers were substantially all of the debtor's assets | | Yes |
| | | v. | Delaware Badge of Fraud 7 – The debtor removed or concealed assets | | Yes |
| | | vi. | Delaware Badge of Fraud 8 – The value of the consideration received by the debtor was reasonably equivalent to the value of the transfers | | **No** |
| | | vii. | Delaware Badge of Fraud 9 – The debtor was insolvent | | Yes |
| | b. | | Were Defendants in a position to dominate or control Debtor? | | No |
| | c. | | Was the domination and control of Debtor by Defendants related to Debtor's transfer of property to Defendants? | | No |
| **3.** | | | **Did Debtor make the transfers without receiving reasonably equivalent value while Debtor was insolvent?** | **Counts III, IV and VI** | **No** |
| | a. | | Under the totality of the circumstances did Debtor receive reasonably equivalent value? | | No |

---

[134] The answers to some of these questions may be "no" but nonetheless be in Plaintiff's favor.  Thus, to avoid doubt, this column identifies whether summary judgment will be entered in Plaintiff's favor for the applicable issue?

| | | | | | |
|---|---|---|---|---|---|
| | | i. | Did Debtor receive fair market value for the transfers? | | No |
| | | ii. | Were the transfers made at arms' length? | | No |
| | | iii. | Did Defendants act in good faith? | | Yes |
| | b. | | Was Debtor insolvent at the time of the transfers? | | Yes[135] |
| **4.** | | | **Were the transfers constructively fraudulent?** | **Count VII** | **Yes as to Farttaroli No as to Masiz** |
| | a. | | Were Defendants insiders? | | Yes as to Farttaroli No as to Maziv |
| | b. | | Were the transfers on account of an antecedent debt? | | Yes |
| | c. | | Was Debtor insolvent at the time of the transfers? | | Yes |
| | d. | | Did Defendants know Debtor was insolvent at the time of the transfers? | | Yes |
| 5. | | | Are the transfers avoidable under section 550 of the Code? | | Yes |
| | a. | | Were the transfers were made for the benefit of Defendants? | | Yes |
| | b. | | Did Defendants receive the transfers in satisfaction of a present or antecedent debt, in good faith, and without knowledge that the transfers may be avoided? | | Yes |
| 6. | | | Assuming the transfers are avoidable for one or more of the reasons set forth above, is Plaintiff entitled to pre-judgment interest on the transfers from the date they were made? | | Yes |

In final summation, the Court will enter summary judgment against Frattaroli under Count VII. The motion for summary judgment on Counts II, III, IV, V and VI is denied. Summary judgment is granted in connection with whether the transfers are avoidable under section 550 of the Code and the award of pre-judgment interest. An order will be issued.

---

[135] Plaintiff has established that Debtor was insolvent under three of the four alternative elements: insolvency; insufficient capital; and intent to incur debt beyond the debtor's ability to pay. Plaintiff is not entitled to summary judgment on the fourth alternative element: whether the transferee was an insider or incurred such obligation to or for the benefit of an insider under an employment contract and not in the ordinary course of business.